[Civ. No. 26050. Second Dist., Div. One. July 24, 1962.]

JEAN MULLIN, Plaintiff and Respondent, v. KAISER FOUNDATION HOSPITALS et al., Defendants and Appellants.

Thelen, Marrin, Johnson & Bridges, Parker, Stanbury, Reese & McGee, James W. Baldwin and John G. Flett for Defendants and Appellants.

William C. Wetherbee for Plaintiff and Respondent.

WOOD, P. J.—Appeal by defendants from an order granting plaintiff's motion for a new trial. The action was for damages resulting from negligence in rendering medical services. Defendant Kaiser Foundation Hospitals, a corporation, owned and operated the hospital where the services were rendered. Defendant Southern California Permanente Medical Group, a partnership, furnished the medical services. Defendant Dr. Haughey was one of the physicians in the Medical Group. In a jury trial, the verdict was for plaintiff for $10,000 against all the defendants. Judgment for that amount was entered. Plaintiff made a motion for a new trial on the ground that "inadequate damages" were given under the influence of passion and prejudice; and also on all the grounds stated in section 657 of the Code of Civil Procedure, except the ground of excessive damages. On July 14, 1961, the court made an order which stated that the motion was thereby granted on

the ground of insufficiency of the evidence to support the verdict and judgment in that the damages were inadequate, unless the plaintiff and the defendants "shall by July 19, 1961, file with the court their consent in writing that the court may make its Order amending the judgment" to increase the amount thereof from $10,000 to $17,500.

Appellants (defendants) contend that the court, in granting a new trial on the ground of inadequate damages, abused its discretion. They argue that the damages awarded were adequate.

█ A new trial may be granted upon the ground of insufficiency of the evidence for the reason that the damages awarded are inadequate. (*Harper* v. *Superior Air Parts, Inc.,* 124 Cal.App.2d 91, 92 [268 P.2d 115]; *Franklin* v. *Bettencourt,* 16 Cal.App.2d 511, 514 [60 P.2d 1017].) █ Upon a motion for a new trial based upon the contention that the damages are inadequate the trial court should review the evidence, not only with respect to the issue of damages but also with respect to the issue of liability. (*Harper* v. *Superior Air Parts, Inc., supra, Bakurjian* v. *Pugh,* 4 Cal.App.2d 450, 454 [41 P.2d 175].)

On October 21, 1958, plaintiff consulted a doctor at the clinic of defendant Southern California Permanente Medical Group in Harbor City, and examinations and tests were made there which indicated that she had been pregnant about two and one-half months. Plaintiff returned to the clinic for prenatal care once a month for the following five months and on four occasions during April 1959. Reports of laboratory tests made at the clinic for albumen in her urine on all occasions prior to April 21 were negative. Reports of tests made on April 21 and 28 showed there was an albumen content of 1 plus and 3 plus on those respective days. On May 4, about 12:30 a. m., plaintiff went to the hospital of defendant Kaiser Foundation Hospitals in Harbor City, registered at the office, and went to the labor room of the hospital.

Shortly after plaintiff entered that room, a nurse, who was in charge of the patients in the labor and delivery rooms of the hospital, tested the blood pressure of plaintiff and ascertained that it was 210 over 100. She told Dr. Haughey (the obstetrician on duty) that plaintiff's blood pressure "was grave." He told her to give seconal to plaintiff. About 1 a. m. plaintiff said that there was a throbbing in her head. The nurse noticed that plaintiff was perspiring profusely and was having trouble in breathing. Other blood pressure tests, given

about 2:30 a. m. and 4 a. m., showed that the pressure was about the same as it had been at 1 a. m. The nurse called Dr. Haughey after each test and reported the results. He told her to follow the routine procedure for patients. She administered pain-relieving drugs, and requested the supervisor to send another nurse to take care of plaintiff. The supervisor told her to "carry on the best she could." Dr. Haughey went to see plaintiff about 4 a. m. About 4:25 a. m. she (nurse) was in the delivery room assisting Dr. Haughey in attending another patient. The nurse testified that at that time no one was in the labor room with plaintiff; the nurse saw plaintiff raise her arm; the nurse went into the labor room, and plaintiff was "just starting to have a convulsion"; the nurse told Dr. Haughey regarding the convulsion, and he prescribed a drug (apresoline) which she gave to plaintiff; plaintiff's blood pressure then went down to 170 over 80; thereafter plaintiff was taken to the delivery room, her hands were tied, and "sometime after" 5 a. m. plaintiff's child was delivered. (Hospital records show that plaintiff was taken to the delivery room at 5:20 a. m.) After the delivery, plaintiff had another convulsion. (Hospital records show that the second convulsion occurred while plaintiff was in the delivery room.) At 5 p. m. plaintiff had another convulsion.

The nurse testified further that she could not recall whether plaintiff's wrists were strapped to the delivery table; that, "We do it for all our patients. . . ."

Dr. Haughey testified that: On May 4, "around" 1 a. m., he received a call from the nurse regarding plaintiff's condition; within 15 or 20 minutes thereafter he examined plaintiff, and took her blood pressure. She was in a critical condition as the result of toxemia.

Hospital records show that Dr. Haughey diagnosed plaintiff's convulsions as eclamptic convulsions.

Plaintiff testified as follows: On the way to the hospital she did not feel any discomfort other than labor pains. She did not remember anything that occurred after she went to bed in the labor room and prior to the time she awoke two or three days after the child was born. When she regained consciousness she noticed a big black and blue mark on the upper part of her left arm, and both her arms were sore. She told the doctors and nurses that her arms and shoulders were sore. The nurses rubbed her arms and shoulders from time to time. When she left the hospital on May 19, Dr. Garthaus (one of the doctors there) told her to "use heat" on her arms, but not to

exercise them. Thereafter she used heat on her arms and shoulders, and the left shoulder "cleared up fine," but her right shoulder continued to hurt. She was not able to use her right arm, and a week after she left the hospital she returned to the clinic, and Dr. Garthaus examined her arm. He told her that she had strained muscles as the result of the convulsions, and to start exercising her arm. After she left the clinic, she tried to use her right arm, but it continued "to be sore." Three weeks after leaving the hospital she returned to the clinic, and told Dr. Garthaus that her right arm was still sore and that she could not use it. He told her that he would call the hospital and make arrangements to take X rays of the arm. He sent her to Dr. Solomon, who sent her to the X-ray department where X rays were made. Two days later Dr. Solomon told her that her shoulder was dislocated. On the following Tuesday she talked with Dr. Jeffries in the Edgemont Clinic of defendant Medical Group in Los Angeles, and he told her that she would have to undergo surgery on her shoulder. The following Thursday she entered the hospital, and an operation was performed the following day (June 26, 1959). She remained in the hospital five days. Her arm was taped to her body—taped from the top of her shoulder to her waist—for a period of six weeks after the operation. After the tape was removed, she "wore" a sling for three weeks. During that nine-week period she was not able to take care of her child. Her arm is "still sore," and it gets "tired real fast." She cannot lift heavy objects without discomfort.

Plaintiff testified further: At the time she became pregnant she was employed as an IBM key punch operator at an hourly wage of $2.25. She took a leave of absence, commencing February 13, 1959, which was to continue to September 13, 1959. She returned to work on January 4, 1960, and then was able to perform her work satisfactorily. Her gross salary in 1958 was $4,410.77, and in 1959 was $655.12.

Records of defendant Hospitals show that the operation performed on plaintiff on June 26, 1959, consisted of an open reduction of a dislocated right shoulder. X rays received in evidence show a steel screw in the shoulder. Photographs, in evidence, show that there is a scar, approximately 4 inches long, on the front of plaintiff's right shoulder—the scar extends downward from the top of her shoulder to approximately the under side of her arm.

Dr. Malone, called as a witness by plaintiff, testified that: He has been a physician since 1940, and he specializes in

obstetrics and gynecology. Three plus albumen in urine is abnormal and indicates kidney damage. In his opinion if a test, that is made a week before a child is to be delivered, shows that a woman has that amount of albumen in her urine, she should be hospitalized, given apresoline and magnesium sulfate, and should be placed on a high-protein and low-salt diet. It would be proper practice to take X rays of a patient who had a convulsion before or after the delivery of a child. He examined plaintiff on May 8, 1961. In his opinion she probably had minute hemorrhages in her brain at the time of the convulsions, and there was some damage to her kidneys. By reason of having had the convulsions, she should have observation and continued care for the remainder of her life.

Dr. Malone also testified to the effect that it was improper practice to fail to administer apresoline or magnesium sulfate or glucose to plaintiff after she entered the hospital and before she had the first convulsion; that there should have been a special nurse for plaintiff during that period; that in his opinion if plaintiff had been given such treatment and care, the convulsions would have been prevented.

Dr. Pheasant, called as a witness by plaintiff, testified that: He has been a physician since 1937. He examined plaintiff on September 9, 1959. There was some atrophy of the deltoid muscle of her right shoulder, and the muscle was smaller on the left side. On her right side, plaintiff had less than 50 per cent of the arm elevation that she had on her left side. She could not turn her right arm ''out on the right to any degree.'' Extension was 20 degrees on the right and 60 degrees on the left. In his opinion the disability is permanent, and there will be no improvement in the condition of the shoulder and arm.

There was testimony by expert witnesses called by defendants to the effect that any damage to kidneys as the result of toxemia and eclamptic convulsions is ordinarily temporary in nature.

All hospital and medical expenses of plaintiff, except a charge of $183 by Dr. Pheasant, were furnished to plaintiff as a subscriber to the health plan of defendant Medical Group.

Appellants contend that the court abused its discretion in granting the motion for a new trial. They argue that the evidence was insufficient as a matter of law to establish liability of defendant Kaiser Foundation Hospitals for any negligence except the failure to discover, treat, and care for the fractured and dislocated shoulder at any earlier time; that it

cannot be said as a matter of law that the amount of the judgment was inadequate to compensate plaintiff for the restriction of motion of her right arm and shoulder and for the pain and suffering which were incidental to the care and treatment of the fracture and dislocation.

 " '[T]he granting of a motion for a new trial rests within the discretion of the trial judge to such an extent that an appellate court will not interfere unless an abuse of discretion clearly appears. All presumptions are in favor of the order and it will be affirmed if it is sustainable on any ground.' (*Ballard* v. *Pacific Greyhound Lines,* 28 Cal.2d 357, 358 [170 P.2d 465].) In passing on a motion for a new trial the trial judge is entitled to reweigh the evidence and exercise his independent judgment thereon and if he concludes that the damages awarded do not adequately compensate for the injuries sustained he may grant a new trial." (*Harper* v. *Superior Air Parts, Inc.,* 124 Cal.App.2d 91, 94 [268 P.2d 115].)

 There was evidence that defendants were negligent in failing to give proper drugs and care to plaintiff between the time she entered the hospital and the time of the first convulsion, and that if she had been given proper drugs and care during that period, she would not have had the convulsions; that she sustained permanent injury to her kidneys by reason of the failure of the defendants to give her proper drugs and care; that defendants were negligent in failing to take X rays of plaintiff's shoulders and arms before she left the hospital, and that as a result she was incapacitated for many more weeks than she would have been incapacitated if the dislocation had been discovered and treated earlier; and that there was permanent injury to plaintiff's right shoulder. There was also evidence from which the trial judge could reasonably infer that the right shoulder was dislocated when plaintiff had a convulsion on the delivery table. Plaintiff testified that on the way to the hospital she did not feel any discomfort other than labor pains; she did not remember anything that occurred after she went to bed in the labor room and prior to the time she awoke two or three days after the child was born; when she regained consciousness she noticed a big black and blue mark on the upper part of her left arm, that both of her arms were sore, and she was unable to use her right arm. The trial court could infer that plaintiff's arms were strapped to the delivery table, and that the dislocation occurred while she was having a convulsion. There was evi-

dence that the amount of plaintiff's special damages was $2,183 (loss of earnings $2,000, and Dr. Pheasant's charge of $183). It is to be noted, however, that all her hospital and medical expenses (except Dr. Pheasant's charge) were furnished to her as a subscriber to the health plan of defendant Medical Group. The trial judge did not abuse his discretion in granting the motion for a new trial.

The order granting the motion for a new trial is affirmed.

Fourt, J., and Lillie, J., concurred.